## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT NASHVILLE

### DECEMBER 1998 SESSION

**FILED**

April 20, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **TIMOTHY R. BOWLES,** | * | C.C.A. NO. 01C01-9711-CR-00547 |
| APPELLANT, | * | DAVIDSON COUNTY |
| VS. | * | Hon. Seth Norman, Judge |
| **STATE OF TENNESSEE,** | * | (Aggravated Rape, Attempted Rape, Aggravated Burglary (Two Counts), |
| APPELLEE. | * | Robbery) |

_____

For Appellant:

Terry J. Canady
211 Printer's Alley Building
Suite 400
Nashville, TN 37201

Bill Lane
3200 West End Avenue
Nashville, TN 37203

For Appellee:

John Knox Walkup
    Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN 37243-0493

Timothy Behan
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243-0493

Mary Hausman
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1407

OPINION FILED: _____


AFFIRMED IN PART; REVERSED IN PART


NORMA MCGEE OGLE, JUDGE

## OPINION

On June 18, 1997, the appellant, Timothy R. Bowles, was convicted by a jury in the Criminal Court for Davidson County of aggravated rape, attempted rape, two counts of aggravated burglary, and robbery. The trial court imposed an effective sentence of forty-five years in the Tennessee Department of Correction. In this appeal as of right, the appellant raises the following issues for our consideration:

1. Whether the evidence adduced at trial is sufficient to support the appellant's conviction of aggravated rape;
2. With respect to the aggravated rape conviction, whether the trial court erroneously denied the appellant's request for a jury instruction on the lesser grade offense of sexual battery;
3. With respect to the attempted rape conviction, whether the trial court erroneously declined to instruct the jury on the lesser grade offense of sexual battery; and
4. With respect to the robbery conviction, whether the trial court erroneously denied the appellant's request for a jury instruction on the lesser included offense of theft.

After thoroughly reviewing the record and the parties' briefs, we reverse the appellant's robbery conviction and otherwise affirm the judgment of the trial court.

## I. Factual Background

The proof at the appellant's trial established that, on March 23, 1996, the appellant was drinking alcohol and abusing cocaine throughout the day. That evening, between 11:30 p.m. and midnight, the appellant broke through the front door of Leland Cutlip's home at 4107 Hermitage Street in Davidson County. Mr. Cutlip was in bed when the appellant entered his bedroom. Mr. Cutlip testified at trial:

> [The appellant] yanks the covers, just pulls them straight back, and gets in my face, and looks at me and says, oh,

2

you're a man, huh.

Mr. Cutlip further testified that, following this exchange, the appellant "rolled his eyes up toward the ceiling" and departed.[1]

On the same night, the appellant proceeded to his aunt's home, which was located in the same neighborhood, at 333 Hadley Bend Boulevard.  At trial, Ms. Hampton testified that she was awakened shortly before midnight when her nephew broke through her front door.  She walked to the living room to investigate and observed her nephew standing in the front door.  She asked him why he was in her home, and the appellant replied, "Come on, Edna, come on."  He then pushed Ms. Hampton down the hallway toward her bedroom.  He pushed her onto the bed and attempted unsuccessfully to remove Ms. Hampton's nightshirt and separate her legs.  The appellant unfastened his pants, exposing his genitalia.  Ms. Hampton was "pushing and kicking and screaming, trying to keep him off me … ."  The struggle continued for approximately five or ten minutes.

At some point, however, the appellant abandoned his assault and stated, "Edna, I've gone crazy … I've lost my mind."  The appellant then dialed 911 and gave the telephone to Ms. Hampton.  Ms. Hampton spoke to the 911 operator, although she was breathless and had difficulty speaking.  While Ms. Hampton was on the telephone, the appellant left her home.

Ms. Hampton stated at trial that she did not smell alcohol on the appellant, but that he was acting unusually.  She testified that, generally, the appellant was a nice person, and that she had loved him as if he were her son.  She confirmed on cross-examination that the appellant did not touch her genital area or

---

[1] At the conclusion of the State's proof, the trial court dismissed the charge of burglary of Mr. Cutlip's home.  However, the court permitted the State to argue in closing that Mr. Cutlip's testimony contradicted the appellant's claim that he was breaking into homes solely in search of money.

penetrate her in any way, but stated that she knew he was attempting to rape her. Specifically, she denied that he was just "scuffling" with her, explaining that "he kept trying to get my legs apart and trying to put his body on mine."

Following the appellant's assault, Ms. Hampton's voice "would go and come" for months thereafter. She additionally suffered bruises on both arms and on her shoulder; her right leg was cut; and her right toe was "mashed and bruised." She had difficulty walking for months after the incident.

On March 23, 1996, the appellant also broke into the home belonging to Mrs. Kathleen Dobbs and her husband. On that date, Mrs. Dobbs and her husband were living at 118 Center Street, in the same neighborhood with Mr. Cutlip and Ms. Hampton. Mrs. Dobbs testified that she was eighty-two years old at the time of the appellant's trial. At the time of these offenses, her husband was eighty-five years old and bedridden with emphysema and diabetes. By the time of the appellant's trial, Mr. Dobbs was deceased.

On March 23, 1996, both Mrs. Dobbs and her husband were at home. Mrs. Dobbs testified that she had arisen from her bed shortly before midnight in order to give her husband "breathing treatments." Her husband slept in an adjoining bedroom. Mrs. Dobbs was dressed in a blouse and slacks, because she knew she would be caring for her husband that night.

Mrs. Dobbs was sitting by the stove in the kitchen when she heard a sound on the porch. She then heard someone kicking the front door. She told her husband that someone was attempting to break into the house. The intruder could not force the front door open and, accordingly, went to a door located on the side of the porch. At this point, Mrs. Dobbs called 911. She told the operator that someone was breaking into her home and asked that the police "please hurry, please hurry."

4

She then heard her husband calling and placed the telephone receiver on a table while she went to her husband.[2]  She then heard glass breaking at the back door.

The appellant came through the back door, through the dining room, into Mr. Dobbs' bedroom.  Mrs. Dobbs was standing in her husband's bedroom, next to her husband.  The appellant pushed Mrs. Dobbs into her bedroom and onto the floor.  The appellant pulled her slacks and underwear off, and then unfastened his own pants.  The appellant exposed his genitalia and attempted to penetrate Mrs. Dobbs.  Mrs. Dobbs testified that the appellant touched her in the genital area with one hand while holding his penis in his other hand.  She further stated that the appellant was unsuccessful in achieving penetration, "[b]ecause it was just flat, I reckon, he just couldn't do it."

The appellant ceased his assault upon Mrs. Dobbs and ran into her husband's bedroom, where Mr. Dobbs was lying in his bed.  Mrs. Dobbs followed the appellant and observed him violently push several items, including Mr. Dobbs' respirator, off of a dresser onto the floor.  He then picked up Mr. Dobbs' pants from the foot of the bed and removed Mr. Dobbs' billfold, which contained approximately $200.00.  Mrs. Dobbs testified that her husband exclaimed, "Kathleen, he's got my billfold."  The appellant immediately left the house.  Mrs. Dobbs testified that both she and her husband were "scared to death."

Mrs. Dobbs stated that the back of her head struck the floor when the appellant pushed her onto the floor of her bedroom.  Following the assault, she was bleeding profusely from her head, her arm, and her finger.  Additionally, she suffered bruises on her hip.  Upon the arrival of the police and the ambulance, Mrs. Dobbs was taken to Tennessee Christian Medical Center.  She testified that she

---

[2] The State introduced at trial the recordings of both Mrs. Dobbs' and Ms. Hampton's 911 calls.

spoke with a nurse at the hospital, but could not remember what she told the nurse. She stated that she was "tore up so bad I don't remember exactly what I told her." She conceded that she probably told the nurse that she did not think the appellant had penetrated her. She explained, "[T]he term of rape to me, I thought that you had to really insert it up, you know, in you." She then stated that the appellant's penis did not penetrate her genital area. When asked if she thought the appellant's fingers penetrated her genital area, she responded, "Yes, I know they was down there ... ."

On cross-examination, Mrs. Dobbs testified again that the appellant did not "penetrate" her, if penetration "means to go all the way up in you." However, she stated that the appellant inserted the end of his penis into her genital area. She testified that "it was up against my vagina. He could not do anything." Moreover, she testified that his fingers "was some inside. Not all the way up in me but on the side." Mrs. Dobbs reiterated that she had previously denied penetration or being raped, both to the medical personnel at the hospital and during a preliminary hearing, because she "thought that whenever you was raped or anything that it'd have to go all the way. He'd have to put it ... plum all the way up in you." In conclusion, she testified:

> If you're talking about all the way up in me, no, he didn't get all the way up in me. He tried to and he got it in and then he had his fingers on there and he tried to put it up in there and he could not. But he didn't get it all the way up.

Mrs. Dobbs testified that, following this incident, she moved from her home, "because I just couldn't stand to live there. I was just scared so bad." Dorothy Lannom, Mrs. Dobbs' daughter-in-law, testified that, after the assault, Mr. and Mrs. Dobbs lived in her home. Mrs. Dobbs would not leave her bedroom nor would she speak with her husband for three weeks after the assault. Mr. Dobbs died approximately three months thereafter.

Dorothy Lannom additionally testified at trial that she received a call from her mother-in-law just after midnight on March 24, 1996. Mrs. Dobbs was screaming and crying. She told Mrs. Lannom that a man had broken into her home and was attempting to kill her. Mrs. Lannom and her husband immediately drove to Mrs. Dobbs' home. Mrs. Dobbs was "so bloody. She was sitting in there at her dining room table and blood was just all over her head and her arms and her clothes and all." Mrs. Lannom later observed bruises on Mrs. Dobbs' legs and on her right rib cage. She further testified that the wound to Mrs. Dobbs' head did not fully heal for a long time. Mr. Dobbs was also very frightened on the night of the offenses. Mrs. Lannom explained that she could tell "[b]y the expression on his face, his eyes, and his mind. It just done something to his mind."

Danny Duncan, a police officer with the Metropolitan Nashville Police Department, was dispatched to the Dobbs' home in the early morning hours of March 24, 1996. Officer Duncan testified at trial that, when he arrived at the Dobbs' residence, Mrs. Dobbs was bleeding profusely and appeared to be very upset and afraid. Her husband was lying on his bed attached to a respirator. He also appeared very upset and afraid.[3] Officer Duncan further testified that Mrs. Dobbs did not tell him that she had been sexually assaulted, only that "she was hurt real bad." He stated that elderly victims are generally more reluctant to talk about sexual matters, and "her husband was there and he was so upset I think she was trying to help protect him, so she didn't want to go into a lot of details with me."

Susan Stephens, a detective with the Sexual Abuse Unit of the Metropolitan Nashville Police Department, testified that she was assigned to investigate the cases of Edna Hampton and Kathleen Dobbs on March 24, 1996.

---

[3] Officer Cole Womack testified that Mr. Dobbs appeared to be distraught and was having difficulty breathing.

She visited the Dobbs' residence in the aftermath of the appellant's offenses. Detective Stephens testified that Mr. Dobbs was "extremely upset and very emotional." Detective Stephens proceeded to Tennessee Christian Medical Center, where she spoke with Mrs. Dobbs about the appellant's assault. At that time, Mrs. Dobbs told the detective that she did not think penetration had occurred. The detective testified that she did not press Mrs. Dobbs for details of the assault due to Mrs. Dobbs' emotional condition. In fact, at the hospital and prior to the preliminary hearing in this case, Detective Stephens did not have an opportunity to speak extensively with Mrs. Dobbs about the assault. Subsequently, on July 24, 1996, she was able to talk with Mrs. Dobbs in detail about the extent of penetration that had occurred. On the basis of this later interview, Detective Stephens asked that the grand jury indict the appellant for aggravated rape.

Detective Stephens also testified that possible rape victims in Davidson County are generally transported to Metropolitan Nashville General Hospital, where forensic rape examinations are routinely performed. These examinations are *not* regularly performed at other area medical facilities, including Tennessee Christian Medical Center. Nevertheless, because her injuries appeared to be serious, the ambulance transported Mrs. Dobbs to Tennessee Christian Medical Center. The detective stated:

> There was a lot of blood. She had a large laceration in the back of her head that was still bleeding, as a matter of fact, even when I arrived at the hospital.
>
> She had damage to her arm, and bruising on her leg. And she had – one of her fingers was, was very bruised or bloody.

Detective Stephens testified that she spoke with medical personnel at the hospital and understood, from her conversations with the doctors, that they had only examined Mrs. Dobbs for evidence of vaginal penile penetration.

Marilee Weingartner, a family nurse practitioner who performs forensic

rape examinations at General Hospital, testified that in order to reach the vaginal opening of a female, an object would need to pass through two separate folds of skin. She observed that medical personnel commonly do not understand that simply separating the folds of skin leading to the vagina can constitute penetration under Tennessee law.

Kathy Suttle, a registered nurse, testified that, she was employed at Tennessee Christian Medical Center in March, 1996, and examined Mrs. Dobbs following the appellant's assault. Ms. Suttle testified that Mrs. Dobbs was emotionally distressed and, other than a housecoat, was wearing no clothing below the waist. Ms. Suttle recounted:

> She had a bandage on her head and a bandage on her left arm. Her hands had blood on them.… her legs had blood on them.

> She had blood, well, from her waist all around the front of her abdomen, all in her crotch area had blood on it, all the way to about her knees.….

Ms. Suttle confirmed that an examination of Mrs. Dobbs' "crotch area" revealed no cuts, abrasions, scratches, or other obvious sources of the blood covering that area. Moreover, she testified that the pattern of the blood in Mrs. Dobbs' "crotch area" was *not* consistent with a theory that a cut on Mrs. Dobbs' finger bled on her legs when she was either removing or putting on clothing. Another nurse washed the blood from Mrs. Dobbs before the police could photograph the blood or otherwise preserve the evidence.

Ms. Suttle stated that Mrs. Dobbs denied that penetration had occurred during the assault. However, at the time of these events, Ms. Suttle understood penetration to mean "penile penetration to [the victim's] vagina." Ms. Suttle also read to the jury the notes recorded by the examining physician. The doctor noted the possibility of rape and a conversation with Detective Stephens concerning the possibility of "attempted rape." The doctor recorded, "The man was

9

bleeding from his hand, fondled her genital area, did not penetrate her."

With respect to Mrs. Dobbs' physical injuries, Ms. Suttle referred to her contemporaneously recorded notes. She testified:

> There were skin tears to [Mrs. Dobbs'] left arm, a laceration to her right fifth digit, a hematoma to her head which was oozing…. And she complained of pain to her left shoulder.

Regarding the wound on the back of Mrs. Dobbs' head, Ms. Suttle stated that "the skin was all abraded and worn and generally looked like raw hamburger."

Shelly Betts, a forensic scientist at the Tennessee Bureau of Investigation Crime Laboratory and a specialist in Serology and DNA testing, confirmed that blood found on Mrs. Dobbs' underwear matched blood samples obtained from the appellant. Additionally, blood retrieved from Ms. Hampton's nightgown matched the appellant's blood samples.

The appellant testified on his own behalf. He testified that, on March 23, 1996, he spent the day at a club with friends, drinking and "getting high." He was still high on cocaine when he ran out of money to purchase alcohol and cocaine and decided to steal money in order to continue his carouse. The appellant admitted that he broke into the homes of Mrs. Dobbs and Edna Hampton in order to steal money. Moreover, he admitted that he cut himself and was bleeding when he broke into the Dobbs' home. However, he denied that he attempted to rape or sexually assault either woman.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant first challenges the sufficiency of the evidence to support his conviction of the aggravated rape of Mrs. Kathleen Dobbs. In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a

10

criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant's argument rests solely upon his contention that the State failed to prove sexual penetration of the victim beyond a reasonable doubt. The appellant cites in support of his argument the inconsistent statements by Mrs. Dobbs concerning whether or not penetration occurred.

Aggravated rape is the "unlawful sexual penetration of a victim by the defendant … accompanied by … bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (1997). The legislature has defined sexual penetration in the following manner:

> "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight,* of any part of a person's body … into the genital … openings of the victim's … body, but emission of semen is not required … .

Tenn. Code Ann. § 39-13-501(7) (1997)(emphasis added).

We conclude that the record amply supports the jury's finding of sexual penetration. As noted earlier, Mrs. Dobbs testified at trial that both the appellant's penis and his fingers slightly penetrated her genital opening. Although she conceded that she had previously denied that penetration had occurred, she explained that she did not understand at that time the legal definition of penetration. At the time of her prior inconsistent statements, she believed that penetration meant full penile penetration of the vagina. See, e.g., State v. Beauregard, No. 02C01-9712-CC-00457, 1998 WL 217901, at **2-3 (Tenn. Crim. App. at Jackson, May 5, 1998)(despite victim's testimony that "it wouldn't go in" and a lack of physical trauma, the jury could have concluded that the victim's references to the lack of penetration concerned only a lack of vaginal penetration).

This court has previously held that "[i]t is the rule of law in Tennessee that contradictory statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 449-450 (Tenn. Crim. App. 1993). However, we further noted that this rule of law is only applicable when the inconsistency is unexplained or when neither version of the witness' testimony is corroborated by other evidence. Id. at 450. In this case, Mrs. Dobbs offered an explanation for her prior inconsistency. The jury found the appellant guilty of aggravated rape, accrediting her testimony and resolving the conflict in favor of the State's theory. Williams, 657 S.W.2d at 410. This argument is without merit.

B. Lesser Included and Lesser Grade Offenses

The appellant also argues that the trial court committed error by failing to instruct the jury on several lesser included and lesser grade offenses of the charged offenses. The trial judge has a duty to charge the jury as to all the law of each offense included in the indictment, even absent a request by the defendant. State v. Cleveland, 959 S.W.2d 548, 553 (Tenn. 1997). Moreover, a defendant has a right to have every issue of fact raised by the evidence and material to his or her

12

defense submitted to the jury on proper instructions. State v. Robinette, No. 03C01-9611-CR-00430, 1997 WL 671889, at * 3 (Tenn. Crim. App. at Knoxville, October 29, 1997). Thus, a defendant has a right to a jury instruction on all lesser included offenses and lesser grades or classes of the charged offenses if the facts are susceptible to an inference of guilt on any of those offenses. State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); State v. Cutshaw, 967 S.W.2d 332, 341-342 (Tenn. Crim. App. 1997); Tenn. Code Ann. § 40-18-110 (1997); Tenn. R. Crim. P. 31(c).

An offense is necessarily included in another if the elements of the greater offense include, but are not congruent with, all the elements of the lesser offense. Trusty, 919 S.W.2d at 310. See also State v. Miller, No. 01C01-9703-CC-00087, 1998 WL 601241, at *8 (Tenn. Crim. App. at Nashville, September 11, 1998). In contrast, whether or not an offense is a lesser grade or class of the charged offense is determined by reference to the statutory scheme. Trusty, 919 S.W.2d at 310. Generally, lesser grades or classes of the charged offense will be codified in the same part of the chapter. Id. at 311-312. But see State v. Jett, No. 01C01-9707-CR-00236, 1998 WL 598524, at *6 (Tenn. Crim. App. at Nashville, September 10, 1998)(this court observed that it is "doubtful" that the Trusty lesser grade analysis would be applicable to offenses contained in Title 39, Chapter 17, Part 3 due to the loose characterization of offenses in that chapter).

As to the offense of the aggravated rape of Kathleen Dobbs, the appellant argues that the trial court should have also charged the jury with the lesser offense of sexual battery. Sexual battery is "unlawful sexual contact with a victim by the defendant … accompanied by … [f]orce or coercion … ." Tenn. Code Ann. §39-13-505(a)(1) (1997). Sexual contact has been defined by the legislature in the following manner:

> "Sexual contact includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or

13

> any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification ...."

Tenn. Code Ann. § 39-13-501(6).

Recently, this court observed that aggravated sexual battery is not a lesser included offense of aggravated rape "since it requires an element that aggravated rape does not: the sexual contact must be for the purpose of sexual arousal or gratification." State v. Mullins, No. 01C01-9803-CR-00115, 1999 WL 22451, at *2 (Tenn. Crim. App. at Nashville, January 21, 1999). See also State v. Long, No. 02C01-9610-CC-00362, 1998 WL 74253, at *13 (Tenn. Crim. App. at Jackson, February 24, 1998)(sexual battery is a lesser grade offense of rape). We note that this conclusion is contrary to other recent opinions of this court. For example, in State v. Dishman, No. 03C01-9610-CR-00361, 1998 WL 191447, at *10 (Tenn. Crim. App. at Knoxville, April 23, 1998), this court stated that aggravated sexual battery is a lesser included offense of aggravated rape and cited State v. Clark, No. 1066, 1988 WL 90448 (Tenn. Crim. App. at Knoxville, September 1, 1988). In Clark, we held that the "sexual penetration" element of rape necessarily encompasses "sexual contact" as defined by the statute. Id. at *2.

We conclude, as in Mullins, that sexual battery is not a lesser included offense of aggravated rape. Our conclusion is guided in part by our supreme court's observation in the context of sentencing that not every rape is committed for the purpose of sexual arousal or gratification, but may instead be motivated by a desire to control, intimidate, or simply abuse another human being. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). Nevertheless, sexual battery is a lesser grade offense of aggravated rape. Mullins, No. 01C01-9803-CR-00115, 1999 WL 22451, at *2. Thus, we must determine if the trial court committed reversible error by failing to instruct the jury on the lesser grade offense of sexual battery. In State v. Elder, 982 S.W.2d 871, 877-878 (Tenn. Crim. App. 1998), our court described the analysis that a trial court must employ in compiling for the jury the appropriate instructions on

lesser offenses:

> [B]efore instructing a jury on a lesser offense, the trial court must determine whether the evidence, when viewed in the light most favorable to the *defendant's* theory of the case, would justify a jury verdict in accord with the defendant's theory, and would permit a rational trier of fact to find the defendant guilty of the lesser offense and not guilty of the greater offense. … If a jury were instructed on a lesser offense even though the evidence did not raise it or the offense was only raised by "slight" or "relatively scant" evidence, then the instruction would constitute an invitation to the jury to return a compromise or otherwise unwarranted verdict.

The appellant testified in this case that he did not sexually assault Mrs. Dobbs at all. However, he also argued to the jury that, regardless of whether or not the jury accredited his testimony, the State's proof did not support a finding of penetration and, therefore, a conviction of rape. The appellant asserts on appeal that Mrs. Dobbs' testimony supported instead a conviction of sexual battery. Yet, the appellant himself concedes that the trial court *did* charge the jury with the lesser grade offense of *aggravated* sexual battery. In light of the undisputed evidence of bodily injury[4] presented at trial, we conclude that the trial court's failure to charge sexual battery to the jury did not constitute error.

Additionally, as to the charge of the attempted rape of Edna Hampton, the appellant contends that the trial court should have instructed the jury on the offense of sexual battery. Sexual battery is a lesser grade offense of attempted rape. See, e.g., State v. Cleveland, 959 S.W.2d 548, 554 n.5 (Tenn. 1997)(sexual battery is a lesser grade offense of attempted aggravated rape). We earlier noted that, in contrast to the offense of rape, sexual battery requires "sexual contact" rather than "sexual penetration." The appellant's aunt testified at trial that the appellant removed his pants, exposing his genitalia, and attempted unsuccessfully

---

[4] The term bodily injury includes a cut, abrasion, bruise, burn, or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty. State v. Smith, 891 S.W.2d 922, 927-928 (Tenn. Crim. App. 1994).

to remove her nightshirt and separate her legs. Ms. Hampton stated that she was wearing no clothing underneath her nightgown. She recalled that the appellant's genitalia did not touch her, although his penis was close to her genital area during the struggle. She also testified that the appellant did not "sexually touch [her] or penetrate [her] in any way." Nevertheless, Ms. Hampton possessed no doubt that the appellant intended to rape her. In fact, the evidence at trial established that, on the same night, the appellant broke into another home and raped the female occupant. The appellant denied that a sexual assault of any kind occurred. Rather, he contended that he struggled with his aunt in order to silence and subdue her.

In summary, the evidence established that the appellant touched Ms. Hampton's nightgown during their struggle. Again, "sexual contact" does include "the intentional touching … of the clothing covering the immediate area of the victim's … intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). However, neither the State nor the appellant adduced evidence that the appellant touched Ms. Hampton's nightgown for the purpose of sexual arousal or gratification. The appellant explicitly denied that he touched his aunt for the purpose of sexual arousal or gratification. Moreover, as noted earlier, evidence that the appellant intended to rape Ms. Hampton, without more, does not mandate an instruction on the lesser grade offense of sexual battery.

The trial court did instruct the jury on the offense of attempted aggravated sexual battery. Again, sexual battery is a lesser grade offense of attempted rape. Moreover, aggravated sexual battery is a lesser grade offense of attempted aggravated rape. However, aggravated sexual battery is *not* a lesser grade offense of rape. Both rape and aggravated sexual battery, although contained in the same part of the code, are Class B felonies. Tenn. Code Ann. § 39-12-107(a) (1997) would reduce each offense to a Class C felony. Accordingly,

neither offense is a lesser grade than the other.  Cf. Jett, No. 01C01-9707-CR-00236, 1998 WL 598524, at *6 (both stalking and harassment are Class A misdemeanors, and therefore neither is a lesser grade than the other).  Accordingly, the trial court erred by instructing the jury on the offense of aggravated sexual battery.  Nevertheless, because the appellant was convicted of the greater offense, we conclude that any error in this regard was harmless.

Finally, with respect to the charged offense of robbery, the appellant argues that the trial court should have instructed the jury on the lesser included offense of theft of property.  We agree that theft is a lesser included offense of robbery.  State v. Sherrod, No. 02C01-9510-CR-00331, 1996 WL 417661, at *3 (Tenn. Crim. App. at Jackson, July 26, 1996).  However, this determination does not finish our inquiry.  We must determine if the evidence adduced at trial would permit a rational trier of fact to find the defendant guilty of the theft and not guilty of robbery.  Elder, 982 S.W.2d at 877.

A theft occurs when a person, "with intent to deprive the owner of the property, … knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (1997).  A robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. §39-13-401 (1997).

A majority of the panel believes that the evidence justifies a rational juror having a reasonable doubt about the theft being " from the person of another by violence or putting the person in fear."  The majority's view is that the defendant's knocking items to the floor, grabbing the wallet and leaving the scene--done while Mr. Dobbs remained in bed--do not constitute overwhelming proof that the theft was from the person accomplished by violence or by putting the person in fear.  Thus, they conclude that an instruction on theft should have been given.

However, the author of this opinion believes that the evidence overwhelmingly establishes the crime of robbery and that there is no credible view of the evidence on which the defendant could have been found guilty of a lesser included offense of theft. State v. Sherrod, No. 02C01-9510-CR-00331, 1996 WL 417611, at *3.

Mrs. Dobbs testified that, after raping her, the appellant ran into her husband's room, where her husband was lying on his bed. Mrs. Dobbs followed the appellant and observed the appellant first violently push several items to the floor, including her husband's respirator, and then grab her husband's wallet from the foot of his bed. That Mr. Dobbs was fully aware of the appellant's actions is demonstrated by Mrs. Dobbs' testimony that he cried out to her that the appellant was taking his wallet. Additionally, Mrs. Dobbs testified that she and her husband were "scared to death." Mrs. Dobbs' daughter-in-law and the police who arrived on the scene immediately following the offenses testified that Mr. Dobbs appeared upset and frightened. On the basis of this evidence, the author of this opinion believes the trial court properly instructed the jury.

### III. Conclusion

For the foregoing reasons, we reverse the appellant's robbery conviction and otherwise affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
John H. Peay, Judge

_____

18

Joseph M. Tipton, Judge